UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

O'DELL PICKETT,            )
                           )
        Plaintiff,         )
                           )
    v.                     )   No. 4:11 CV 760 AGF / DDN
                           )
MICHAEL J. ASTRUE,         )
Commissioner of Social Security )
                           )
        Defendant.         )

**REPORT AND RECOMMENDATION**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff O'Dell Pickett for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and for supplemental security income under Title XVI of that Act, 42 U.S.C. §§ 1382, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the decision of the Administrative Law Judge (ALJ) be affirmed.

**I.  BACKGROUND**

Plaintiff O'Dell Pickett, who was born in 1966, filed applications for Title II and Title XVI benefits on May 28, 2008, and May 31, 2008, respectively. (Tr. 9, 121-27.) He alleged an onset date of disability of August 1, 2007, due to carpal tunnel syndrome in both wrists and elbows. (Tr. 166.) His applications were denied initially on July 31, 2008, and he requested a hearing before an ALJ.[1] (Tr. 70-72, 74-78.)

---

[1]Missouri is one of several test states participating in modifications to the disability determination procedures which apply in this case. 20 C.F.R. §§ 404.906, 416.1406, (2007). These modifications include, among other things, the elimination of the reconsideration step. See id, 20 C.F.R. §§ 404.966, 416.1466 (2007).

On February 11, 2010, following a hearing, the ALJ found plaintiff was not disabled. (Tr. 17.) On February 25, 2011, the Appeals Council denied plaintiff's request for review. (Tr. 1-5.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

On September 14, 2007, plaintiff underwent surgery by Paul Manske, M.D., for decompression of the left median nerve and the right ulnar nerve due to left carpal tunnel syndrome and left cubital tunnel syndrome.[2] Plaintiff tolerated the process well. (Tr. 297-98.)

On November 9, 2007, plaintiff underwent a second surgery by Dr. Manske, this time for decompression of the right median nerve and the right ulnar nerve due to right carpal tunnel syndrome and right cubital tunnel syndrome. Plaintiff tolerated the procedure well. (Tr. 265-66.) Among several medications, plaintiff was prescribed Vicodin and Percocet after surgery[3]. (Tr. 274.) He was discharged that day with instructions to refrain from lifting more than ten pounds and to follow-up in a week. (Tr. 277.)

On January 3, 2008, plaintiff followed-up with Dr. Manske, who noticed a decrease of strength. Plaintiff expressed a desire to return to work, which Dr. Manske gave him permission to do. Dr. Manske informed plaintiff to follow-up in one month for an intended final follow-up. (Tr. 386.)

On January 31, 2008, plaintiff followed-up with Dr. Manske. He had a grip strength of forty to forty five pounds in both hands. He said he had gone back to work but that he still could not do heavy lifting. Dr. Manske instructed him to continue light work and increase weight as tolerated. (Tr. 369.)

---

[2]Carpal tunnel syndrom is compression of the median nerve in the wrist. Stedman's Medical Dictionary at 2055 (28th ed. 2006). Cubital tunnel syndrom is compression of the median nerve in the elbow. Stedman's at 468, 2055.

[3]Vicodin is used to relieve moderate to severe pain. Percocet is to relieve moderate to severe pain. WebMD, http://www.webmd.com/drugs (Last visited on June 13, 2012).

On March 27, 2008, plaintiff returned to Dr. Manske for another follow-up. Dr. Manske observed the nerve releases were doing well, and noted no numbness or tingling in the fingers and no pain in the region of the medial epicondyle or the carpal tunnel.[4] Plaintiff did have an area of tenderness over the triceps tendon on the left that limited his activities. Dr. Manske treated the inflammation with an injection of Xyclocaine and Kenalog.[5] (Tr. 370.) An x-ray of the left elbow showed no abnormality. (Tr. 264.)

On April 24, 2008, plaintiff returned for a follow-up appointment. The injection was doing well. Dr. Manske gave plaintiff permission to return to regular duty work. No return visit was scheduled. (Tr. 372.)

On July 23, 2008, plaintiff was seen and evaluated by Patrick Hogan, M.D. The evaluation revealed that plaintiff was in good health with normal reflexes and no atrophy in his muscles, except for some weakness, or sudden collapse of the limb after a normal initial effort, at both shoulders. Plaintiff stated he had never significantly improved and tried to return to light duty at work but he was unable to perform his tasks so he has not worked since 2007. He also stated there was some pain in his shoulders, arms, and hands. (Tr. 342-44.)

On September 8, 2008, plaintiff was seen again by Dr. Manske. Plaintiff reported pain in his elbows that originated in his shoulders and radiated down his arms to his elbows. Dr. Manske noted that plaintiff's left triceps tendon was tender, the triceps tendon on the right side was tender, and the medial epicondyle was tender bilaterally. Plaintiff had full range of extension in his left elbow and no abnormal sensation in the fingers. Dr. Manske recommended an evaluation by a physiatrist to evaluate plaintiff's shoulders and cervical spine to determine whether they could be the source of the pain. (Tr. 373.)

---

[4]Medial is relating to the middle or center, nearer to the median. Stedman's at 1167.
Epicondyle is the projection from a long bone of the arm near the articular extremity above or upon the knuckle. Stedman's at 653.

[5]Xylocaine injection is used to treat local loss of feeling or sensation. Kenalog injection is used to treat local loss of feeling or sensation. WebMD, http://www.webmd.com/drugs (last visited June 13, 2012).

On September 22, 2008, plaintiff was seen by Caroline Day, M.D., for low back pain. Plaintiff was diagnosed with asthma, hyperlipidemia, lumbago, and headaches. Dr. Day recommended a lumbar x-ray, moist heat treatment, a follow-up in two to four weeks, and medications of Lovastatin, Ibuprofen, Tramadol, and Gabapentin.[6] (Tr. 357-59.)

On September 25, 2008, plaintiff underwent a pulmonary function test at Washington University School of Medicine. Peter Tuteur, M.D., noted no ventilatory defect but significant improvement after the administration of aerosolized bronchodilator. (Tr. 361.)

On October 17, 2008, plaintiff underwent a lumbar x-ray of the lower back. His spine was normal except for a small calcification in the right lung base, in either the lungs or liver, of uncertain etiology. (Tr. 362.)

On October 20, 2008, plaintiff saw Dr. Day. (Tr. 354-56.) Dr. Day prescribed an increase in Gabapentin, continued Tramadol and medication for asthma. (Tr. 355-56.) Dr. Day also recommended plaintiff visit a neurologist if his headaches did not improve. (Tr. 356.)

On October 28, 2008, plaintiff was evaluated by Adam Zierenberg, M.D. (Tr. 376-78.) Plaintiff stated that after surgery his symptoms have not gotten any worse or better from their earlier condition. He continued to have numbness, tingling, and difficulty maneuvering small objects. A physical examination revealed that the strength in his shoulders and upper arms was intact. Strength and sensation in his hands were somewhat diminished. Dr. Zierenberg prescribed Neurontin and ordered EMG's[7]. (Tr. 377-78.)

On November 10, 2008, plaintiff returned to Dr. Day. Dr. Day increased the Gabapentin dosage from 100mg to 300mg. (Tr. 351.) On

---

[6]Lovastatin is used to help lower cholesterol and fats. Tramadol is used to help relieve moderate to severe pain. Gabapentin is used to prevent and control seizures and relieve nerve pain. WebMD, http://www.webmd.com/drugs (last visited June 13, 2012).

[7]Neurontin is used to prevent and control seizures and prevents nerve pain. WebMD, http://www.webmd.com/drugs (last visited June 13, 2012).

November 12, 2008, plaintiff was prescribed Lovastatin for hyperlipidemia. (Tr. 349.)

On November 13, 2008, plaintiff followed up with Dr. Manske who prescribed Motrin and told plaintiff to continue with the Neurontin as prescribed[8]. (Tr. 379.)

On December 5, 2008, plaintiff's prescription for Gabapentin was renewed by Dr. Manske. (Tr. 401.)

On December 15, 2008, plaintiff saw Dr. Manske for complaints of excruciating pain in his left elbow. The medication was not having an effect on the pain. Dr. Manske recommended surgery to remove the medial epicondyle and move the ulnar nerve. Plaintiff was advised to discontinue the Ibuprofen. (Tr. 403.)

On December 17, 2008, plaintiff underwent the recommended surgery by Dr. Manske to remove the medial epicondyle and move the ulnar nerve. (Tr. 418-20.)

On December 22, 2008, plaintiff followed-up with Dr. Manske and noted that the sharp medial epicondyle pain was gone and his wound was healing well. Plaintiff could not completely extend his elbow. Dr. Manske told plaintiff to carry his arm in a sling and have a cloth wrist splint. (Tr. 405.)

On January 8, 2009, plaintiff returned to Dr. Manske. He was in less discomfort but still had a fair amount of soreness and weakness in his arm. He also lacked the ability to completely extend his elbow. (Tr. 407.)

On January 29, 2009, plaintiff followed-up with Dr. Manske. Dr. Manske noted soreness in the medial aspects of his elbow, and that plaintiff had regained nearly full extension and had good flexion. Plaintiff reported generalized discomfort on the lateral aspect of elbow and tenderness over the medial epicondyle. He also reported pains in his cervical spine radiating down both arms and that his strength still had not returned sufficiently to work. Dr. Manske recommended a physiatrist and advised plaintiff to continue working with his therapist. (Tr. 408.)

---

[8]Motrin is used to relive pain from various conditions such as headaches, dental pain, or arthritis. WebMD, http://www.webmd.com/drugs (last visited June 13, 2012).

On January 30, 2009, plaintiff visited physiatrist Heidi Prather, D.O., complaining of three days of episodic right sided neck pain that spread into his hands. On examination, plaintiff was alert and pleasant. Strength testing in his legs was 5/5, and his strength was intact in his deltoid, biceps, triceps, wrist extensor, thumb opposition, and thumb abduction. He had pain with cervical extension, rotation right, and side bending to the right as compared to left. Dr. Prather prescribed Tramadol and Neurontin. (Tr. 411.)

Also on that day, plaintiff visited Dr. Day, reporting great improvement with the headaches due to Gabapentin, but that the back pain was still present. Dr. Day prescribed or refilled several prescriptions including Lovastatin, Tramadol, and Gabapentin for back pain and other conditions. (Tr. 430-31.)

On March 12, 2009, plaintiff returned to Dr. Manske and reported he was doing extremely well; he had no more pain in his elbow; he could fully extend his elbow; and he had normal sensation in his fingers. He did report decreased sensation on the medial aspect of his elbow. He stated he was going to seek another job that did not require heavy lifting and was given permission by Dr. Manske to return to work. (Tr. 413.)

On March 27, 2009, plaintiff returned to Dr. Day, complaining of low back pain. Dr. Day prescribed Ibuprofen and Gabapentin for headaches and back pain. (Tr. 433-35.)

On April 20, 2009, plaintiff saw Dr. Manske. He reported cramping in his muscles emanating from his shoulders, particularly in his arms. He also reported numbness in his fingers and medial epicondyle pain. A physical examination showed that his elbows and hands had not changed substantially from his visit five weeks earlier after the secondary surgery. Plaintiff had full range of motion in his shoulders and no discomfort with his cervical spine. Dr. Manske prescribed Neurontin 300mg and recommended that plaintiff see a physiatrist. (Tr. 414.)

On May 1, 2009, plaintiff went to Dr. Day, reporting left shoulder and arm pain, back pain, and fatigue from the medication. Plaintiff was

taking Gabapentin, Ibuprofen, and Lovastin. (Tr. 436.) Dr. Day prescribed Tramadol and Flovent.[9] (Tr. 438.)

On June 18, 2009, plaintiff visited Dr. Manske upon reports of burning pains periodically down his forearms and a popping in both wrists that occurred about three weeks prior. The left had resolved but the right continued to bother him and was likely sprained. Dr. Manske limited plaintiff to frequently lifting nothing more than ten pounds and occasionally lifting up to twenty-five pounds. Dr. Manske also prescribed Naprosyn and Darvocet.[10] (Tr. 443.)

On June 26, 2009, plaintiff returned to Dr. Day reporting back pain but also that he had stopped taking his Gabapentin. (Tr. 439.) Dr. Day prescribed Lovastatin, ibuprofen, and Tramadol. (Tr. 441.)

On July 7, 2009, plaintiff returned to Dr. Zierenberg, reporting right sided neck problems from radicular symptoms from his shoulders to his arms and hands. A physical exam revealed a mild weakness in his left hand compared to the right and diminished sensation in his hand. He was alert, pleasant, and in no acute distress at the time of the visit. Dr. Zierenberg recommended an MRI, which on July 14, 2009, revealed mild degenerative changes in plaintiff's neck. (Tr. 446-47, 462-63.) Dr. Zierenberg also prescribed increased Neurontin and recommended Ultram.[11] (Tr. 447.)

On July 27, 2009, plaintiff saw Dr. Manske upon complaints of discomfort in the medial aspects of his elbow. The cervical spine evaluation did not reveal any abnormality. Dr. Manske ordered an MRI of the elbow. (Tr. 449.)

---

[9]Flovent is used to control and prevent symptoms caused by asthma. WebMD, http://www.webmd.com/drugs (last visited June 13, 2012).

[10]Naprosyn is used to relieve swelling, joint stiffness, and pain from various conditions such as headaches, muscle aches, tendinitis, and dental pain. Darvocet is used to help relieve mild to moderate pain. WebMD, http://www.webmd.com/drugs (last visited June 13, 2012).

[11]Ultram is used to relieve moderate to moderately severe pain. WebMD, http://www.webmd.com/drugs (last visited June 13, 2012).

On August 6, 2009, plaintiff underwent an MRI of his elbow, which revealed moderate chronic right lateral epicondylitis and mild chondrosis of the right humeroulnar joint.[12] (Tr. 454.)

On September 29, 2009, plaintiff was evaluated by psychologist Paul Rexroat, Ph.D., at the request of the state agency, and on October 10, 2009, Dr. Rexroat prepared a Medical Source Statement of Ability to Do Work-Related Activities ("Mental"). (Tr. 465-73.) Dr. Rexroat described plaintiff as easily established, socially confident, and comfortable interacting. His approach to assessment talks was methodical and orderly. He was appropriately persistent, recognized errors, and responded realistically. (Tr. 469-70.) Dr. Rexroat diagnosed mild mental retardation and a GAF of 49.[13] (Tr. 473.) An IQ test revealed a full-scale IQ of 65. (Tr. 470.)

On the Mental, Dr. Rexroat stated plaintiff's ability to understand and remember simple instructions, carry out simple instructions, make judgments on simple work related decisions, interact with public, interact appropriately with co-workers, and respond appropriately to usual work situations and changes in a routine setting was a mild impairment.[14] His ability to carry out complex instructions and make

---

[12]Epicondylitis is inflammation of the epicondyle, a projection from the long bone near the articular extremity above or upon the knuckle. Stedman's at 653. Chondrosis is the softening, loss, or deterioration of cartilage. Stedman's at 369.

[13]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components.
On the GAF scale, a score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

[14]Mild Impairment is a slight limitation in this area, but an individual can generally function well. (Tr. 465.)

judgments on complex work related decisions was an extreme impairment.[13]
These limitations were attributed to plaintiff's low IQ scores.
(Tr. 465.)

**Testimony at the Hearing**

On July 23, 2009, plaintiff appeared and testified to the following at the hearing before the ALJ. (Tr. 25-53.) He is 5 feet 6 inches tall and weighs 220 pounds. (Tr. 27.) He graduated from high school in special education classes. He does not have extra schooling, either junior college or vocational training. (Tr. 31.) He previously worked as a hide tanner, machine operator, laborer, dishwasher, janitor and meter reader. (Tr. 32-35.) He was fired from his last job for accumulating too many negative points while working. (Tr. 33.) He does not do housework, cook, do laundry, or comb his hair because of the pain in his hands and arms. (Tr. 37-38.)

His pain has only gotten worse since his surgeries. (Tr. 40.) He gets little sleep because of the pain and when he wakes in the morning he just stares at the walls. He does not go out during the weekends and is not very sociable. (Tr. 41.) He is on Gabapentin, Tramadol, Ibuprofen, Advil, Aspirin, Tylenol, Benedrul, and a cholesterol pill. (Tr. 42-44.)

He has had three surgeries and has not gotten any better after them. (Tr. 45.) The medicine has made him drowsy or put him in a daze. He can only stand for about five minutes or walk half a block before needing to sit. (Tr. 47-48.) He has pain in his fingers and cannot hold things such as a gallon of milk for long. (Tr. 49-52.) He cannot read well. His girlfriend helped him fill out the social security forms and he had to cheat to pass his driver's license test. (Tr. 53.)

A vocational expert (VE) also appeared and testified to the following. (Tr. 57-62.) The ALJ first asked the VE to outline plaintiff's past work in terms of job title, skill number, and extertional level. (Tr. 58.) The ALJ then asked the VE whether a

---

[13]Extreme impairment is a major limitation in this area. There is no useful ability to function in this area. (Tr. 465.)

- 9 -

hypothetical individual of plaintiff's age, education, and work experience, who could perform the exertional demands of sedentary work (lift, carry, push, pull ten pounds occasionally, frequently sit, stand, and walk), would have any transferable job skills. The VE testified no and that this individual would not be able to perform any of plaintiff's past work. However, the VE also testified that this hypothetical individual could work as an assembly line fabricator or security guard monitor. the ALJ then asked the VE to include a restriction of only occasional use of upper extremities for fine manipulation. The VE testified that this individual could still perform the security guard monitor job. (Tr. 59-60.)

### III. DECISION OF THE ALJ

On February 11, 2010, the ALJ issued a written decision unfavorable to plaintiff. (Tr. 9-18.) At Step One, the ALJ determined plaintiff had not engaged in substantial gainful activity (SGA) since August 1, 2007. At Step Two, the ALJ determined plaintiff had severe impairments of residual carpal tunnel, cubital tunnel syndrome, and mild mental retardation. At Step Three, the ALJ found that plaintiff did not have an impairment or combination of impairments that meet or medically equals one of the listed impairments. (Tr. 11.)

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform unskilled sedentary work activity. (Tr. 16.) The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent that they are inconsistent with the RFC assessment. (Tr. 15.)

In terms of plaintiff's physical capabilities, the ALJ noted that while plaintiff complained of pain in his upper extremities, his treating surgeon's only limitation was for him to lift under ten pounds, the same as the RFC. The x-rays of plaintiff's cervical spine and MRIs of his cervical spine and elbow showed no disabling abnormality. Also, while plaintiff has limited himself in his daily activities, none of his treating physicians have limited him. On June 18, 2009, Dr. Manske

imposed physical limitations on plaintiff after a sprain. Dr. Manske also noted that plaintiff's bilateral grip strength was 40-45 pounds. (Tr. 15-16.)

In terms of intellectual functioning, the ALJ noted that plaintiff has had many different jobs such as machinery operator and meter reader, and that there was no record of plaintiff having any trouble conducting himself at social functions. Plaintiff did have an IQ score of 65, but he also had a high school IQ test score of 80. The ALJ also noted that while testing there was no indication plaintiff had difficulty understanding or taking the test, as the examiner stated; plaintiff was appropriately persistent in working on a task; he was methodical and orderly; and he understood instructions readily. Last, the ALJ gave no weight to the GAF score of 49 because there was no objective finding to substantiate it. (Tr. 16.)

At Step Four, based on the RFC determination and the VE testimony the ALJ found plaintiff unable to perform any past relevant work. (Tr. 16.)

At Step Five, the ALJ determined, based on VE Testimony, that there were other jobs existing in significant numbers in th national economy that plaintiff could perform. The ALJ therefore found that plaintiff was not disabled under the Act. (Tr. 17-18.)

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary

outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would result in either death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). Id. The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Id. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

## V. DISCUSSION

Plaintiff argues that the ALJ erred in (1) failing to include any mental limitations when determining his RFC, even after finding a severe mental impairment at Step Two; (2) assessing the credibility of his subjective complaints; and (3) failing to determine whether his obesity constitutes a severe impairment.

**A. RFC Determination**

Plaintiff argues that the ALJ erred in failing to include any mental limitations when determining his RFC, even after finding a severe mental impairment of mild mental retardation at Step Two.

A claimant's RFC is the most a claimant can perform despite his physical or mental limitations. 20 C.F.R. § 404.1545(a). The ALJ has "the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010). "[A] claimant's RFC is a medical question and 'at least some' medical evidence must support the ALJ's RFC determination." Wildman, 596 F.3d at 969 (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).

When determining a claimant's RFC, the ALJ is required to include a "narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).

The court should look at the ALJ's opinion as a whole to determine whether the ALJ properly determined the claimant's RFC. See Wiese v. Astrue, 552 F.3d 728, 733-34 (8th Cir. 2009) (looking to the entirety of the ALJ's opinion to determine whether the ALJ's RFC determination was supported by substantial evidence).

Here, the ALJ's narrative discussion of the medical evidence, including evidence of non-exertional limitations, spanned almost five pages. (Tr. 12-16); see Wiese, 552 F.3d at 733-34 (ALJ's discussion lasted four pages). First, the ALJ noted plaintiff's high school education, special education classes, and subjective complaints of trouble with reading and writing. (Tr. 12.) The ALJ then noted plaintiff's subjective complaints of the mental side effects from his medication, namely, feeling "dizzy and drowsy" or that he was in a "daze." (Tr. 13.) The ALJ then considered the psychological consultative examination by Dr. Rexroat, including Dr. Rexroat's description of plaintiff's social interaction and test taking ability. The ALJ also looked at plaintiff's IQ test results. (Tr. 14.) The ALJ also compared the IQ test to a previous IQ test plaintiff had taken in high school, seventeen years earlier. (Tr. 14-15.)

The ALJ specifically discussed plaintiff's GAF score of 49, assessed by Dr. Rexroat. The ALJ compared this score with the objective evidence and found no objective evidence to substantiate any serious symptoms or impairments in social and occupational functioning. (Tr. 16.) The ALJ also found that this score was not supported by plaintiff's testimony, past work experience, or limitations. The ALJ then assigned the GAF score no weight. (Tr. 16); see Jones v. Astrue, 619 F.3d 963, 974 (8th Cir. 2010) (explaining that the ALJ can afford greater weight to medical evidence and testimony than to the GAF score).

The ALJ also specifically discussed plaintiff's intellectual functioning. (Tr. 16.) The ALJ compared the two IQ tests and two IQ scores. The ALJ compared plaintiff's past school records of special education classes to plaintiff's previous jobs. The ALJ noted that while plaintiff testified to reading and writing problems, there was no indication that he had a problem understanding or taking the recently written IQ test. The ALJ considered that plaintiff had no complaint, nor any history of problems with social interaction. The ALJ concluded,

> he has successfully worked in the past in a variety of jobs, without any serious limitations attributable to his mental functioning. There is no indication in the record that [plaintiff] would have any limitation in performing unskilled sedentary work activity.

(Tr. 16.)

Therefore, the ALJ considered plaintiff's non-exertional mental limitations in both the narrative discussion spanning the entire report and specifically in two paragraphs discussing the GAF score, intellectual functioning, and other possible limitations.

Moreover, the ALJ required the VE to consider plaintiff's mental limitation by asking the VE to consider only jobs of plaintiff's "skill level." (Tr. 58.) The VE described "unskilled" jobs of assembly line fabricator and security guard monitor. (Tr. 60.) Plaintiff's counsel specifically questioned the VE about the necessary reading level required for the security guard monitor job. (Tr. 61-62.) When the ALJ has considered the non-exertional limitation, and the VE has considered the non-exertional limitation, the ALJ's findings are supported by substantial evidence. Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997) (holding that

- 14 -

"intellectual functioning . . . is a significant non-exertional impairment that must be considered by a vocational expert").

The ALJ did not place the word "unskilled" in the bold heading, instead stating only that "[plaintiff] has the residual functional capacity to perform the full range of sedentary work." (Tr. 12.) But the ALJ, the VE, and plaintiff's counsel all discussed plaintiff's ability to work in terms of unskilled positions. (Tr. 57-62.) The ALJ concluded his decision stating "[t]here is no indication in the record that the claimant would have any limitations to performing <u>unskilled</u> sedentary work activity, based on his intellectual functioning." (Tr. 16) (emphasis added.)

In sum, the context indicates that the ALJ's omission of "unskilled" from the heading was at most inadvertent and not prejudicial. It does not warrant reversal.

**B. Credibility**

Plaintiff argues that the ALJ erred by failing to sufficiently address all of the relevant credibility factors set forth in the applicable cases. Specifically, plaintiff argues that the ALJ's summary credibility discussion is insufficient and that the ALJ failed to consider the side effects of his medication.

To assess a claimant's credibility, the ALJ must look at (1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side affect of medication; (5) functional restrictions (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008); <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ does not need to recite and discuss each of the <u>Polaski</u> factors when making a credibility determination. <u>Casey v. Astrue</u>, 503 F.3d 687, 695 (8th Cir. 2007). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1218 (8th Cir. 2001). If an ALJ rejects the subjective complaints of the plaintiff, the ALJ must "make an

express credibility determination explaining the reasons for discrediting the complaints." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).

The ALJ articulated several reasons for finding plaintiff's testimony not credible concerning the intensity, persistence, and limiting effects of his symptoms. (Tr. 15-16.) Plaintiff testified that he does no housework, cooking, or laundry, and during the day "he just sits and stares at four walls." (Tr. 12-13, 36-37, 41.) Plaintiff testified his daughter fixes his hair and his girl friend helps him put on his shoes and socks. (Tr. 13, 38.) He testified he can only stand for around five minutes and walk half a block. (Tr. 13, 47-48.) Plaintiff also testified about pain in his upper extremities and limitation of his functions after his last surgery. (Tr. 15, 40.)

The ALJ must judge the credibility of the claimant's subjective complaints in light of observations by third parties, including physicians. Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003) In discounting plaintiff's credibility, the ALJ noted that none of plaintiff's treating doctors limited him in his daily life in this way. (Tr. 15.) The only limitation imposed on plaintiff by a doctor was not to lift more than 10 pounds frequently and 25 pounds occasionally. (Tr. 15, 443)

The ALJ then considered the X-rays of plaintiff's cervical spine and MRIs of his cervical spine and elbow, which revealed no disabling abnormalities. (Tr. 15.) Dr. Manske had indicated that twelve weeks after the bilateral carpal cubital tunnel surgeries plaintiff had a grip strength in both hands of 40-45 pounds. (Tr. 16, 369.) The ALJ can discount subjective complaints when there are inconsistencies in the record as a whole. Pearsall, 274 F.3d at 1218.

In January 2009, physiatrist Heidi Prather noted that plaintiff was pleasant and alert during their meeting. (Tr. 411.) The ALJ considered the report by Dr. Paul Rexroat from September 2009. Dr. Rexroat stated that plaintiff was "socially confident and comfortable in his interactions . . . [he] generally understood instructions." Dr. Rexroat described plaintiff's overall approach as "methodical and orderly . . . he was appropriately persistent." (Tr. 469.) Finally, the ALJ noted that plaintiff informed Dr. Manske in March 2009 that he would be looking for

a job that did not involve any heavy lifting. (Tr. 16.) The ALJ considered the discrepancies between plaintiff's subjective mental complaints and the objective medical information. An ALJ is entitled to determine that a claimant's testimony about his subjective complaints is not credible when objective evidence contradicts the testimony. Baker v. Barnhart, 457 F.3d 882, 892-93 (8th Cir. 2006).

The ALJ did not recite every Polaski factor but considered the relevant information in assessing plaintiff's credibility. Samons v. Astrue, 497 F.3d 813, 820 (8th Cir. 2007). In sum, substantial evidence supports the ALJ's credibility analysis. E.g., Casey, 503 F.3d at 695 (deferring to the ALJ's credibility finding when the ALJ pointed to substantial evidence in the record to discount claimant's subjective complaints).

**C. Obesity**

Plaintiff argues that the ALJ erred in failing to determine whether his obesity constitutes a severe impairment.

Obesity is an impairment which might cause non-exertional limitations and which might significantly restrict a claimant's ability to perform the full range of sedentary work. Lucy, 113 F.3d at 909 (8th Cir. 1997). However, the ALJ's failure to discuss a claimant's obesity in an RFC determination is not necessarily erroneous if, for example, no physician placed physical limitations on the claimant's ability to perform work-related functions because of the obesity. See McNamara v. Astrue, 590 F.3d 607, 611 (8th Cir. 2010); Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004). Further, a claimant's failure to allege work-related limitations caused by obesity also supports an ALJ's abstention from discussing the claimant's obesity. McNamara, 590 F.3d at 611; see Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003). If "neither the medical records nor [the claimant's] testimony demonstrates that [his] obesity results in additional work-related limitations," then "it [is] not reversible error for the ALJ's opinion to omit specific discussion of obesity" in the RFC analysis. McNamara, 590 F.3d at 612.

Here, plaintiff did not allege obesity as a disabling impairment during his testimony to the ALJ or in his application. See Davis v.

Barnhart, 197 F. App'x 521, 522 (8th Cir. 2006) (explaining that ALJ does not err by not considering an impairment not alleged by the claimant and not found in the medical record). Further, plaintiff did not allege any limitations stemming from obesity and did not mention that his weight caused problems in his testimony before the ALJ. Moreover, no doctor identified any limitations from his obesity. The medical records did not contain any indication that plaintiff's obesity limited his ability to work. See Anderson, 344 F.3d at 814 (8th Cir. 2003) (holding that the claimant waived his argument concerning obesity because he did not allege any limitations from his obesity in his applications or in his testimony).

Thus, the ALJ's failure to determine whether plaintiff's obesity constituted a severe impairment is not error.

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security is affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on July 16, 2012.